No. 30,155.

In re Application of Owen Oberst, by His Guardian, Ed Marcum, for a Writ of Habeas Corpus.

(299 Pac. 959.)

Opinion filed June 6, 1931.

*C. L. Aikman,* of El Dorado, *John Madden, John Madden, Jr.,* and *L. C. Gabbert,* all of Wichita, for the petitioner.

*Roland Boynton,* attorney-general, *R. O. Mason,* assistant attorney-general, *R. C. Woodward,* county attorney, and *C. Glenn Morris,* assistant county attorney, for the respondent.

The opinion of the court was delivered by

Smith, J.: This is an original action in habeas corpus. Owen Oberst was charged with murder alleged to have been committed in Butler county. He pleaded guilty and was sentenced to the penitentiary. Subsequently he filed a motion to withdraw this plea of guilty. This was denied. He appealed, and the judgment of the district court was reversed and it was directed to proceed with the trial.

He was tried three times. Each trial resulted in the jury being discharged on account of not being able to agree upon a verdict.

When the case came on for trial for the fourth time the proceedings were had which are the basis for this action. The trial court at that time made an order reciting the various trials that had been had in Butler county, the length of time each trial had taken, and the number of jurors who had been examined at each trial. It was further recited that in each trial a number of men had been

allowed to sit as jurors who were really not qualified. It was recited that a large amount of publicity had been given the case. The findings of the court ended as follows:

"That it is impossible to secure a fair and impartial jury in Butler county, Kansas, to try said action. That it would be impossible to secure a jury in Butler county, Kansas, in the trial of said action, which would not have on it as a member thereof at least one person who, consciously or unconsciously, held a preconceived and abiding conviction as to the guilt or innocence of the defendant and who was consciously or unconsciously biased and prejudiced either for or against the defendant.

"This order is made upon facts within the knowledge of the court and the judge thereof, and is not made upon the application of the defendant. This order of removal is made for the foregoing causes."

The court then ordered that the "said cause and the trial thereof be and the same hereby is removed to Elk county, in the thirteenth judicial district for the state of Kansas, and the venue of said action is changed to said Elk county." The order then provided for the removal of the body of petitioner to Elk county. The petitioner was present in court and by his attorneys objected to this removal. It should be noted here that Butler and Elk counties are in the same judicial district.

In due time the body of petitioner was delivered to the sheriff of Elk county. Whereupon this action was started. Upon the filing of this action petitioner was released on bond. The question in this case is, Can a change of venue of a criminal case be taken to another county in the same judicial district over the objection of the defendant and without his consent?

To answer this question it will be necessary for us to examine the constitution of our state.

The statute under which the court acted is R. S. 62-1322, and is as follows:

"Whenever it shall be within the knowledge of a court or judge that facts exist which would entitle a defendant to the removal of any criminal cause on his application, such judge or court may make an order for such removal without any application by the party for that purpose. (G. S. 1868, ch. 82, § 178; Oct. 31.)"

Petitioner contends that the only statute giving the court a right to order a change of venue is R. S. 62-1318, as follows:

"Any criminal cause pending in any district court may be removed by the order of such court, or the judge thereof, to the district court of another county in the same district, whenever it shall appear, in the manner hereinafter provided, that the minds of the inhabitants of the county in which the case is

pending are so prejudiced against the defendant that a fair trial cannot be had therein. (G. S. 1868, ch. 82, § 174; Oct. 31.)"

Petitioner contends that as construed by the district court R. S. 62-1322 is unconstitutional. The particular provision of the constitution that it contravenes is section 10 of the bill of rights, which is as follows:

"In all prosecutions the accused shall be allowed . . . a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

An argument is made that the order of the court in this case does not comply with the provisions of R. S. 62-1322, but in view of the conclusion we have reached on the constitutional question it will not be necessary for us to decide that. At this time, however, it is proper for us to state that we have reached the conclusion that the court put the wrong interpretation on R. S. 62-1322, and the importance of the conclusion will become apparent at a later point in this opinion.

We shall decide, therefore, the sole question whether the district court has power to change the venue of a criminal case from the county where the crime is alleged to have been committed to another county in the state. Respondent argues that since the guaranty in the constitution is of a right to be tried by a jury of the county or district, that "district" means "judicial district" and since the change is from one county in a judicial district to another county in the same judicial district section 10 was not violated. It is urged that for this court to hold otherwise it will be necessary to hold that as used in the constitution the words "county" and "district" are synonymous. We think, however, that what such a holding would mean is that the word "district" in section 10 was used to describe something that no longer exists in our state, and that the word at the present time is virtually obsolete as used in section 10.

The writing of constitutions and the forming of governments thereunder is essentially an American institution. At the time of the separation of the thirteen colonies from the mother country it became necessary to formulate a system of government. The result was the constitution of the United States—probably the first time that a government had been founded on a single document. One feature of this document that makes it distinctive is that here was a group of men framing a constitution by which they expected

to be governed. The first thought and care was that there were certain rights which they did not propose to surrender to this new government they were bringing into being. They were written into the federal constitution by the first ten amendments almost coincidental with its adoption by the states.

With the history of the adoption and ratification of the federal constitution before them the pioneers who left the territorial limits of the original thirteen colonies from time to time formed state governments and were admitted into the union. The rights of the states were defined by the federal constitution, but the framers of the constitution of the new states were familiar with the fact that as citizens they owed allegiance to and expected protection from two governments—the federal and the state. With this thought in mind, what is more natural than that the framers of the state constitutions should take care that the same rights should be guaranteed to the citizens by this new government they were bringing forth as were guaranteed them by the federal constitution? This they did. In the Ohio constitution it was called the bill of rights and in our constitution it was called the same. In each case the bill of rights constitutes the first articles presented to the constitutional convention. Almost the same language is used in all of them except in the federal constitution the guaranty as to trial by jury is by a jury of the state or district where the offense is alleged to have been committed, instead of county or district.

The story has been told many times about how families migrated from some of the original states, stopped for a generation perhaps or perhaps only for a few years and came on to Kansas, there to take part in that epic struggle that gave Kansas to the nation. With them they brought the general attitude toward government and mode of thinking of the older state. The bill of rights that was introduced and passed by the Wyandotte convention was taken, to a large extent, as we have seen, from the constitution of Ohio. (Proceedings of Wyandotte Convention, 272.) When section 10 of our bill of rights was proposed by the committee, practically as it appears in our constitution, it was adopted by the convention without a word of debate.

In an inquiry as to what was meant by the use of certain words a consideration of the men who wrote them, and of the time in which they were living, other acts and declarations of the same men, and the impression these acts and words made on those present at the time, is always helpful.

This convention met in the spring of 1859. In 1856 the court of common pleas of Butler county, Ohio, passed on the question in this case in construing the same clause in the constitution of Ohio. (*State v. Arrison*, 10 Ohio Decisions Reprint, 379.) In that opinion the court held that under a constitutional provision similar to the one we are considering the state could not take a change of venue and that the accused was entitled to a trial by a jury of the county where the crime is alleged to have been committed. A later Ohio case by the supreme court departs from the doctrine of that case (*State v. Durflinger*, 73 Ohio St. 154), but the value of the case in our discussion is that at the time the clause was written into our constitution Ohio, the state from whose constitution our clause was taken, had given a certain meaning to the clause, and it is to be presumed that the same language was used with the idea in mind that the same result would be attained.

Respondents, however, do not contend that under the statute upon which they rely the district court could send the case to any county in the state. They depend on the word "district" in the constitution and the fact that the change in this case was taken to another county in the same judicial district. In order to decide this question we must reach a conclusion as to what the framers of our constitution meant when the word "district" was written into that document.

Let us examine, then, the condition of affairs in Kansas at the time the constitution was written. By the act of congress March 30, 1854, the territory of Kansas was organized with practically the same boundaries that it now has except that it extended on the west "to the summit of the Rocky Mountains." By section 17 of chapter 30 of the statute of Kansas territory Breckenridge county was organized; by section 23 Butler county was organized; by section 34 Madison, Butler and Wise counties were attached to Breckenridge for "civil and military purposes." Section 37 of chapter 30 provided "that all the inhabitants residing west of the counties so organized or attached shall be attached to the counties they are immediately west of."

By these provisions in territorial days the jurisdiction of the district court of Breckenridge county extended to the "summit of the Rocky Mountains" within its latitude and those of its attached counties. Chapter 41 provided for three judicial districts and fixed the counties that each district comprised. In the case of the

counties to which reference was just made a number of counties were included in the third judicial district, besides the one just named. So that at the time the constitution was written the territory over which the judge of the third judicial district had jurisdiction consisted of the original counties named in section 3 of chapter 41 of the Laws of 1855, the counties created by that chapter but not yet organized and attached to some of the organized counties, and the territory immediately west of these counties to the summit of the Rocky Mountains. Surely the framers of the constitution wished to provide some machinery for trying persons who were not included in the judicial district as organized by the act referred to, hence provided that one accused of crime should be tried by a jury of the county or if the crime was committed in territory not included in any organized county then by a jury of the district where the crime was alleged to have been committed. To hold any other way would be to render meaningless the entire provision referred to. There is no provision anywhere in the law for a jury of a judicial district. A jury panel is always selected from the county—never from a district. If the writ in this case should be denied and the petitioner held for trial in Elk county, no one would say that he was being given a trial by a jury of his judicial district. It would be a jury of Elk county.

In *State v. Ruth,* 21 Kan. 583, this court held that the framers of the constitution must have intended to provide for the administration of justice in all the vast domain not included in organized counties at the time the constitution was adopted.

In the case of *State v. Knapp,* 40 Kan. 148, 19 Pac. 728, defendants had asked a change of venue to another county in the same judicial district. However, that case was sent to a county in another district. This court held that this was error and said:

"It is contended upon the part of the state that the statute authorizes a change of venue in a criminal cause, on the motion of the state, from one county to another, and from one judicial district to a different judicial district. (Crim. Code, secs. 173, 176.) We said in *The State v. Bunker,* 38 Kan. 741, that—

" 'The design of the provision of the bill of rights seems to be to secure to the accused a trial by a jury from the vicinage where the crime is supposed to have been committed, so that he may have the benefit of his own good character and standing with his neighbors, if these he has preserved, and also of such knowledge as the jury may possess of the witnesses who give evidence before them. The word "district," like the word "county," is here used in a restrictive sense, and is intended to designate the precise portion of territory or division of the state over which the court at any particular sitting may

exercise power in criminal matters.' (*Olive v. The State,* 11 Neb. 1; *Dugan v. The State,* 30 Ark. 41; *The State v. Gut,* 13 Minn. 341; *Wheeler v. The State,* 24 Wis. 52.)

"Again, in *The State v. Potter,* 16 Kan. 80, it was said, 'but with this provision (Const., Bill of Rights, sec. 10) the defendant in a criminal action can be tried by any other jury, and out of the county and district where the offense is alleged to have been committed, only with his consent.'" (p. 150.)

Respondents urge that this opinion recognizes the rule that if the change had been within the district the action would have been approved, but the question there was whether the defendants waived their right to be tried in the county by their motion for a change of venue. There is an answer to this contention of respondents in the following language, which we quote again:

"The word 'district,' like the word 'county,' is here used in a restrictive sense, and is intended to designate the precise portion of territory or division of the state over which the court at any particular sitting may exercise power in criminal matters."

The precise portion of territory over which the district court of Butler county may exercise power at any particular sitting is Butler county, and when the judge of the thirteenth judicial district moves over into Elk county any jurisdiction that he has is as the judge of the district court of Elk county. While court is sitting in Elk county it has no power to reach over into Butler county and take any judicial action.

The constitution provided, however, that in the case of unorganized territory attached to a county for judicial purposes, one charged with the commission of a crime in the district over which a court sitting in the county had jurisdiction could be tried before a jury of what vicinage? Plainly the vicinage or district over which that particular court had been given jurisdiction.

As far as this court has passed on the question involved, it has held that a defendant was entitled to be tried by a jury of the county where the crime is alleged to have been committed.

In arriving at the meaning to be given a constitutional provision it is helpful to ascertain what the people have thought about it. What better criterion of the ideas of the people on this question than the legislature. In the session of the legislature for 1903 a resolution to amend section 10 of the bill of rights was introduced in the senate. It was as follows:

"In all prosecutions the accused shall be allowed . . . a speedy public

trial by an impartial jury of the county or judicial district in which the offense is alleged to have been committed." (S. C. R. No. 8; S. Journal, 1903, p. 78.)

This resolution was referred to the judiciary committee of the senate, which reported it out with the recommendation that a substitute be passed, which was as follows:

"In all prosecutions the accused shall be allowed . . . a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but in case sufficient qualified jurors cannot be found in such county, then such trial may be had by an impartial jury of some other county of this state. . . ." (Subst. S. C. R. No. 8; H. Journal, 1903, p. 933.)

This resolution passed the senate.

It will be seen that the first resolution introduced aimed at the very question we are discussing. It simply changed "district" to "judicial district." If that resolution had passed and been adopted by the people the present action would not be here. The substitute was, no doubt, introduced so that there could be a change of venue on the part of the state from counties where one county comprises a judicial district. Another reason for the substitute was, no doubt, that the original resolution would not afford any relief unless the entire machinery for drawing and impaneling a jury was changed so as to provide for a jury of the district. At any rate, it is persuasive that in 1903 the lawyers of the legislature who made up the judiciary committee of the senate did not think the state could take a change of venue over the objection of the defendant, even in a case where sufficient qualified jurors could not be found in the county where the crime was alleged to have been committed. The house of representatives passed and introduced the same resolution and it was approved by the judiciary committee. There were some mistakes in the enrolling of the resolution, and for that reason the attorney-general advised the secretary of state that he should not submit it to the people. For that reason the people never had a chance to vote on it.

Public interest in the question did not stop, however. In 1912 the State Bar Association had the matter up through its committee on crimes and criminal procedure. That committee called attention of the association to the fact that such a resolution had been passed and recommended that the attorney-general be requested to investigate with a view of procuring the submission of the amendment for adoption. (Proceedings of Bar Association for 1912, p. 20.)

In the time that elapsed between the 1912 meeting and the 1913 meeting the case of *State, ex rel., v. Sessions,* 87 Kan. 497, 124 Pac. 814, was decided. This case held that the amendment could not be submitted at that late date. At the meeting of the association for 1913 the following recommendation of this committee was adopted by the association:

"The change of venue from one county to another within the district should be allowed to the state where it is made to appear to the trial court that it is doubtful if a jury can be obtained in the county where the prosecution was brought." (Proceedings of the Bar Association of Kansas for 1913, p. 21.)

Not all the best lawyers in the state belong to the Bar Association, nor are all the lawyers who belong to it good ones, but certainly it is the agency through which the bar of the state keeps abreast of the times, and through which the bar makes its ideas felt on the legislature as to what legislation and constitutional amendments are needed for the good of the society as a whole. Certainly the lawyers of the type who take an interest in such things thought a constitutional amendment necessary before the state could take a change of venue. This is what the books refer to as a constructive interpretation, which should be given weight on a question of this kind.

Decisions from other courts are not wanting to sustain the view that a change of venue cannot be taken without the consent of the accused. *In re Nelson,* 19 S. D. 214, held that a statute which gave the state a right to a change of venue where it appears that a fair and impartial trial cannot be had in the county or subdivision where the action is pending violated a constitutional provision in the same words as the one we are considering. There the court said:

"To what is one accused of crime entitled? 'A speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.' There is nothing uncertain or ambiguous in this language, except, perhaps, the use of the word 'district,' which has uniformly been construed to mean the trial district, or territory from which the jury is summoned." (p. 221.)

To the same effect is *Olive v. The State,* 11 Neb. 1. This case has been referred to heretofore in this opinion and the language quoted as it was in the opinion in *State v. Knapp,* supra. In *Wheeler v. The State,* 24 Wis. 52, the supreme court of that state held a statute invalid which gave the state the right to a change of venue. The provision in the constitution contained the words "county or

district" just as ours does. In *State v. Charles and John Denton*, 46 Tenn. (6 Coldwell) 539, the guaranty in the constitution was by a jury of the county or district. The court held that this meant that he had a right to be tried in the county. In *State v. Dyer*, 139 Mo. 199, while it was not necessary to a decision, the supreme court held that the constitution of that state guaranteed defendant a trial by a jury of the county where the crime was alleged to have been committed. In *Ex Parte Rivers*, 40 Ala. 712, the constitution guaranteed a trial by an impartial jury of the county or district in which the offense was committed. The court held that no change of venue could be made except by the consent of the accused. To the same effect is *State v. Albee*, 61 N. H. 423; *State v. Greer*, 22 W. Va. 800; *People v. Powell*, 87 Cal. 348; and *Osborn v. State*, 24 Ark. 629. *The State of Minnesota v. Gut*, 13 Minn. 341, is a case which more nearly describes the situation in Kansas at the time of the adoption of our constitution than any case we have found. In that state the constitution guaranteed the accused a trial by a jury of the county or district where the crime is alleged to have been committed. By a statute a number of counties were attached to another for judicial purposes. Provision was made for the selection of jurors from all the counties to attend court at a place which would be common to all the counties. This place of holding court was changed from one county to another during the pendency of the prosecution in question. Defendant objected that this was depriving him of his right to a trial by a jury of the county or district where the crime was alleged to have been committed. The court held, however, that since the jury before which he was tried did come from all the different counties in the district that his argument was not good. The situation was much the same as existed in so many counties in Kansas just prior to and immediately subsequent to the adoption of our constitution. One county in a locality would be organized according to law. There was a vast amount of unorganized territory adjacent to it. Some counties were bounded and located but not equipped with offices and other governmental machinery. These counties were being settled and disputes were arising. The territorial legislature had made arrangements providing a government for this unorganized domain by attaching it to an organized county. If the constitution had provided that the trial of one accused of crime must take place in the county where the offense is alleged to have been committed there would have been endless con-

fusion about bringing one to trial who was charged with having committed a crime in some of the unorganized territory. In fact, the administration of justice would have broken down.

It is interesting to note that most of the cases cited arose while a new state was in process of organization and settlement. The same clause is found in the federal constitution where the accused is guaranteed a "speedy trial by an impartial jury of the state or district wherein the crime shall have been committed, which district shall have been previously ascertained by law." This provision was written into the constitution at a time when there was the vast domain of public land, not a part of any state, and undergoing the process of settlement and organization. That the word "district" was not intended to mean "judicial district" in that constitution is indicated by the fact that in cases like that of Kansas, where the state constitutes a judicial district but is divided into divisions, the accused is held to be entitled to be tried by a jury of the division where the crime is alleged to have been committed.

We are aware that there are some authorities which do not agree with the conclusion that we have reached. In the cases of *State v. Durflinger,* supra; *State v. Holloway,* 19 N. Mex. 528, 146 Pac. 1066; L. R. A. 1915F 922; *Glinnan v. Judge of Recorder's Court,* 173 Mich. 674; *Hewitt et al. v. State,* 43 Fla. 194, and others cited, the courts hold that the guaranty is to a trial by an impartial jury of the county or district if one can be had there, and if an impartial jury cannot be secured then the right no longer exists. It appears to us that such a conclusion cannot be reached without ignoring the words in the constitution "of the county or district where the crime is alleged to have been committed." All authorities agree that a jury, to be a jury at all, must be impartial. That would have been met then by a simple guaranty of a trial by jury. The convention went further than that, though, and provided for an impartial jury of the county or district where the crime is alleged to have been committed. Shall we say that those words were put into the constitution for no reason at all?

The argument made by the authorities above referred to is that the right on the part of the state to take a change of venue when an impartial jury cannot be found in the county where the crime is alleged to have been committed exists upon the ground of the necessity of preserving and enforcing its authority. Those who follow that rule, however, overlook entirely the first declaration of this

principle in America when the colonies charged King George in the Declaration of Independence with "transporting us beyond seas to be tried for pretended offenses." Perhaps the king argued that it was necessary to transport offending colonists to England to try them there in order to preserve his authority. The result was Paul Revere's ride, Lexington and Concord, the independence of the colonies, the framing and adoption of the constitution at Philadelphia and finally the adoption of the Wyandotte constitution. Through all these stirring events runs the thought of the rights of man guaranteed by the constitution, the most important of which is the right of trial by a jury of the vicinage. No revolution will follow from an interpretation of this clause to-day, but it is a beneficial thing for us in construing so important a provision of our constitution to consider the times and conditions that gave it birth.

If such a holding is necessary in order to preserve the authority of the commonwealth, then the framers of the constitution provided a way to achieve that end, and that is by amending the constitution. The amending of that document is the business of the people, not the courts. The writ will issue and the sheriff of Elk county is directed to deliver the body of Owen Oberst to the sheriff of Butler county, there to be dealt with according to law.

JOHNSTON, C. J. (dissenting): I am unable to concur in the foregoing conclusion, and, very briefly, I place my dissent on the theory that as the constitution authorizes the trial of an accused by a jury of a county or district in which the offense was committed, and as the constitution provides for the creation of judicial districts, the manifest meaning is that an accused may be tried in the judicial district wherein the offense was committed. That view was recognized and practically declared in *The State v. Knapp*, 40 Kan. 148, 19 Pac. 728, and *The State v. Kindig*, 55 Kan. 113, 39 Pac. 1028. These authorities evidently were followed by the trial court, and I think justified its ruling in granting the change of venue.