#30400-r-JMK
**2025 S.D. 14**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DONIKA RAE GONZALES,                    Petitioner and Appellee,

    v.

WANDA MARKLAND, Warden,
South Dakota Women's Prison,            Respondent and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BUFFALO COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                    Attorneys for respondent and
                                        appellant.


THOMAS P. REYNOLDS of
Kennedy, Pier, Loftus & Reynolds, LLP
Yankton, South Dakota                   Attorneys for petitioner and
                                        appellee.

* * * *

ARGUED
APRIL 24, 2024
OPINION FILED **03/05/25**

#30400

KERN, Justice

[¶1.] Donika Rae Gonzales was convicted in 2014 by a jury, comprised of Brule and Buffalo County residents, of beating her boyfriend's son to death. Gonzales filed a petition for a writ of habeas corpus challenging her conviction on the grounds that the use of a jury district, which included both Brule and Buffalo County residents, unconstitutionally diluted the percentage of prospective Native American jurors available for voir dire. Gonzales also claimed that she was deprived of the effective assistance of counsel by her attorney's alleged failure to introduce certain items into evidence at trial. After an evidentiary hearing, the habeas court concluded that the jury district violated both the federal and state constitutions and reversed Gonzales' conviction on these grounds. The habeas court did not address the ineffective assistance of counsel claims. We reverse.

**Factual and Procedural Background**

[¶2.] On April 11, 2014, at the close of a nine-day jury trial in Brule County, Donika Rae Gonzales was found guilty of first-degree manslaughter and aggravated assault. Gonzales was sentenced to 130 years in prison for the manslaughter conviction and a concurrent 15 years for the assault conviction.[1] During the trial, the State accused Gonzales of beating her boyfriend's four-year-old son to death in Buffalo County. The State introduced evidence that, after the child wet his pants, Gonzales threw him to the ground and began kicking and stomping on him. As a result, the child suffered lacerations to his liver, an injured pancreas, and multiple fractured ribs. The child ultimately died from blunt force trauma to his abdomen.

---

1.    This sentence was later reduced to 90 years with 50 suspended.

[¶3.]    Leading up to the trial, the circuit court had several discussions with both Gonzales and the State concerning the venue for the trial and the jury selection process. The county seat for Buffalo County is in Gann Valley, an unincorporated city with an extremely small courthouse facility.[2] Gonzales expressed a preference for the trial to be held in Brule County, at the courthouse located in Chamberlain, even though her actions constituting the charged offenses had occurred exclusively in Buffalo County. Initially, at her arraignment on April 15, 2013, Gonzales was informed by the circuit court that she would be tried by a Buffalo County jury.

[¶4.]    The circuit court initially sent out jury questionnaires to only residents of Buffalo County, however, an inadequate number were returned. In an email on January 7, 2014, the circuit court explained to counsel that, since only 50 Buffalo County residents—less than the minimum of 54 necessary for voir dire—had returned the jury questionnaire, it would be necessary to include residents of Brule County in the jury pool, as authorized by a 2011 standing order by the presiding judge of the First Judicial Circuit.[3] This standing order was promulgated pursuant to SDCL 16-13-18.4, which provides:

> If any county within a circuit has a population of less than five thousand, the presiding circuit court judge may create a jury

---

2.    The population of Gann Valley in 2010 was 14. *See* U.S. Census Bureau, South Dakota: 2010 (Nov. 2012), https://www2.census.gov/library/publications/2012/dec/cph-1-43.pdf.

3.    At a subsequent hearing, the court informed both parties that, in addition to the 51 Buffalo County residents who ultimately completed the initial questionnaire, 3 additional residents had responded to a follow-up special questionnaire, for a total of 54.

> district by joining that county with one or more counties within the circuit until the total population of the counties exceeds ten thousand. Each county in such a jury district is entitled to pro rata representation upon the master jury list to be computed by the presiding judge upon the basis of the last official census.

In addition to the small number of residents, 39% of the population of Buffalo County was below the age of 18, further reducing the number of prospective adult jurors.[4]

[¶5.]     At a subsequent hearing on January 15, 2014, Gonzales—through her counsel—expressed an understanding that the jury would be "made up of a mixture as much as possible of Buffalo and Brule County residents." This was confirmed by a stipulation, later signed by both parties, that the jury questionnaires would be sent to residents of both Brule and Buffalo Counties.

[¶6.]     At the time of the jury trial, Buffalo County had a population of 1,912 residents, of which 84% were Native American. Brule County had a population of 5,264 residents, of which 8.5% were Native American. Pursuant to SDCL 16-13-18.4, the 2011 standing order merged these two counties into a jury district with a combined Native American population of 29%. The jurors were drawn on a 3-1 ratio based on the population of the counties as prescribed by SDCL 16-13-18.4. As a result, for Gonzales' trial, the jury pool consisted of 236 total jurors, with 182 (77%) residents of Brule County and 54 (22%) residents of Buffalo County. During voir dire, both the State and Gonzales exercised 20 peremptory challenges each. Gonzales struck two jurors from Buffalo County and the State struck one. In total,

---

4.     These statistics are taken from the habeas testimony of Kim Allison, the First Judicial Circuit Court Administrator.

the State struck three Native American jurors and Gonzales struck two. Ultimately, the jury was comprised of two Native American and twelve non-Native American jurors.[5]

[¶7.] After her conviction, Gonzales appealed, raising nine issues and asking this Court to reverse her judgment of conviction. However, this Court summarily affirmed the conviction by order on February 22, 2016. *See State v. Gonzales*, 877 N.W.2d 106 (S.D. 2016). Gonzales filed an application for writ of habeas corpus on October 6, 2016. Gonzales subsequently filed several amended habeas applications, with varying claims for relief. However, the third and final amended application, filed on March 5, 2019, asserted two grounds for relief: 1) "the jury pool did not consist of a fair cross-section of the community in which the crime occurred and because she was not tried by a jury from the county in which the crime occurred," and 2) ineffective assistance of counsel, alleging trial counsel was ineffective by not explaining and informing Gonzales "of the ramifications of the [c]ourt impaneling both Brule and Buffalo County Jurors" and by not objecting to impaneling a jury in such manner.[6]

---

5. Two jurors were later dismissed as alternates.

6. Gonzales also alleged that her counsel was ineffective for failing to offer certain evidence at trial that she claimed was exculpatory. However, in its memorandum opinion, the habeas court ruled that all of Gonzales' ineffective assistance claims, with the exception of those relating to the jury composition, were "facially without merit." Accordingly, the habeas court's certificate of probable cause did not include these other claims.

[¶8.]    During a three-day trial, the habeas court heard from several witnesses.[7] Gonzales first called Christine Obago, the tribal treasurer of the Crow Creek Tribe, to provide information about the demographics of the jury panel used for Gonzales' trial. Obago testified that, based on her personal knowledge, 53 out of the 236 individuals in the jury pool were Native American. However, Obago also admitted that, because she was not as familiar with Brule County residents, she might have failed to identify Native American members of this population on the jury panel list. Indeed, she recognized only six Brule County residents as having Native American heritage.

[¶9.]    Next, Gonzales testified on her own behalf. She informed the habeas court that she had not "waive[d] [her] right to a jury of [her] peers from Buffalo County." She also testified that her attorneys had not explained to her "the repercussion[s] of having both Buffalo and Brule County jurors in the jury pool." However, on cross-examination, Gonzales conceded that she reviewed a list of potential jurors—consisting of both Buffalo and Brule County residents—with her attorneys. In addition, she acknowledged that she was present at a pretrial conference on February 28, 2014, when jury logistics were discussed in detail. At this conference, the court specifically noted that the jury would be drawn from both Buffalo and Brule Counties and neither Gonzales nor her attorneys objected.

[¶10.]    Gonzales also called Phil Peterson, a criminal defense lawyer with over 46 years of criminal and civil experience, as an expert witness. He testified that a

---

7.    After all the judges of the First Circuit recused themselves, the case was assigned to the Honorable Douglas Hoffman of the Second Judicial Circuit.

jury comprised of Gonzales' peers should be taken from "a county with 84 percent Native American" population. Thus, according to Peterson, the jury pool in this case violated the Sixth Amendment of the United States Constitution by depriving Gonzales of a jury comprised of her peers. Peterson also concluded that the 2011 standing order unconstitutionally and systematically diluted the percentage of Native American jurors available to Gonzales. However, Peterson readily admitted on cross-examination that, in forming his opinions, he had not applied the "absolute disparity" calculations related to jury composition found in *St. Cloud v. Class*, 1996 S.D. 64, 550 N.W.2d 70, and *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).[8] Peterson also acknowledged that he made no conclusions as to whether SDCL 16-13-18.4 violated the South Dakota Constitution.

[¶11.] After both parties concluded their examination of Peterson, the habeas court embarked on a lengthy series of narrative and leading questions. During these exchanges, the court interjected previously unpled and unaddressed arguments into the case. Most prominently, the court focused on the historical concept of vicinage:

> Court: I am going to throw you a real curve ball now. Have you ever heard of the term, and I confess I didn't until I looked it up for the purposes of this trial - - but have you heard of the term "vicinage," vicinage, V-I-C-I-N-A-G-E?
>
> Peterson: Vicinage?

---

8. In *St. Cloud*, this Court concluded that an absolute disparity of 12.5% between the percentage of Native Americans in the jury pool versus the underlying population was less than the 15% "at which the jury panel should be supplemented." 1996 S.D. 64, ¶ 19, 550 N.W.2d at 76.

Court: Vicinage.

Peterson: I don't believe so.

Court: So according to "Blackstone," and we recognize Blackstone as being, kind of, the parent authority of English common law, at least in the relative modern era; is that fair from law school?

Peterson: That is fair.

Court: And so according to "Blackstone," in medieval England the vicinage of the jury referred to a jury drawn from the relevant county; is this maybe something that I should have the lawyers do a little research on when they're doing their post-trial briefs if from time in memorial and the jury trial system and our system of law that the vicinage of the jury means the neighborhood of the jury is historically as the county?

. . .

Court: So now that I have described for you what "Blackstone['] defined for you as the vicinage of the jury. Does that seem to bear some significance to this issue of whether there is any really big deal if we take a little Native American county and mix it in with a much bigger white county and try the Native Americans for murder in - - with a white jury?

Peterson: I think certainly.

Court: And so then if that concept of the vicinage in the county was incorporated into the Constitution of the State of South Dakota, does that mean that this issue really is a Constitutional dimension and not just statutory magnitude?

Peterson: Yes, very much.

[¶12.] As a result of this development, the State requested a continuance:

Thanks, Judge. Based on the Court's comments and the colloquy that the Court had with Mr. Peterson, frankly, at least,

> from Respondent's perspective, it completely changes the complexion as to where things are at. And at this point, the Respondent is going to ask for a continuance, and respectfully request. And I appreciate the Court making it's [sic] remarks as far as some of its concerns and so forth. These appear to be branching, at least from Respondent's perspective, outside of the issues that are specifically alleged in the Third Amendment [sic] position.
>
> That being said, we would respectfully request the Court provide us some guidance in terms of its concerns that it outlined or some clarification. And a continuance or an opportunity to conduct additional research and very likely develop additional witnesses and alter the indicated testimony of our witnesses.

However, the habeas court directed both sides to continue presenting the testimony of their witnesses. Although it expressed a willingness to grant further time for research after the conclusion of the habeas hearing, the court strongly suggested that the central issue remained the same—whether there was "systemic exclusion of the Native American community." In response, the State pointed out that, based on Gonzales' third amended habeas application, they had focused on whether the jury pool was a "fair cross-section of the community." The State suggested that the relevant community was the jury district, which included both Buffalo and Brule County.

[¶13.]     As her final witness, Gonzales called Kim Allison, the Court Administrator for the First Judicial Circuit, to testify regarding the jury pool selection and the development of the 2011 standing order. Allison specifically testified that Brule County was selected for combination with Buffalo County because other nearby counties, such as Aurora and Douglas, had an even lower

percentage of Native American residents.[9] Allison also explained that Charles Mix County, which has a significant Native American population was considered for inclusion, but rejected because of its distance from Buffalo County.

[¶14.]    The State began its case by calling attorneys Donna Bucher and Douglas Papendick, who represented Gonzales at trial. Among other topics, Bucher testified regarding her general strategy for defending Gonzales. She highlighted her concerns about the difficulty of selecting a sufficient number of jurors exclusively from Buffalo County. She also expressed concerns about whether the physical facilities at the Gann Valley courthouse could accommodate a jury trial. She described the courthouse as comprised of a small community room, with one bathroom and no available place nearby to get food for those involved in the trial.

[¶15.]    Bucher testified that Gonzales had agreed to hold the trial in Brule County using a jury combined of persons from the two counties:

> Q:    So just so we're clear, [Gonzales] agreed that the trial could be in Brule County?
>
> A:    Yes. We - - we're talking about the jury districting issue, and we did talk about a change of venue as well. But she wanted it to be there.
>
> Q:    Okay. The jury district issue and the change of venue, those were separate and distinct issues?
>
> A:    They were separate, yes. Yes.
>
> Q:    When you say "change of venue," you're talking about a change to a different county other than Buffalo or Brule.

---

9.    Allison also pointed out that neighboring Hughes and Hyde Counties, which both had a higher percentage of Native American residents than Brule, could not have been included in a jury district with Buffalo County because they were in the Sixth Judicial Circuit.

A:    Right.

Q:    And that would have been done with a separate motion and a separate hearing?

A:    I don't think we ever filed a motion for it. She didn't want it. She didn't want it changed.

Q:    She wanted it to stay.

A:    She wanted it to stay in Brule County so she would have a Brule and Buffalo County jury.

Q:    Using the jury district as you had explained to her.

A:    Yes.

Q:    Just so we're clear, did Ms. Gonzales agree to the using of the jury district?

A:    Yes.

Bucher concluded by testifying that she was not aware of "any misfeasance or malfeasance on the part of anyone that would tend to deprive Ms. Gonzales of a substantial right[.]"

[¶16.]    Doug Papendick, Gonzales' other trial counsel, testified that the jury district was authorized by the South Dakota Constitution and that Gonzales was aware that Buffalo and Brule County jurors would be combined for purposes of selecting her jury and did not object:

Q:    Well, let me ask you this, if you know. Are jury - - if you know, are jury districts authorized under the South Dakota Constitution?

A:    Yes, they are.

Q:    Would that be pursuant to Article VI, Section 7 as you understand it?

A: Yes.

Q: Based on that, would there have been any logical basis to object as to the jury district relative to our state constitution?

A: No, there would be nothing prohibiting the court from using jury districts.

Q: And as you understand, that would be under Judge - - or within [the circuit court's] discretion?

A: Yes.

Q: Any reason to object to it as Ms. Gonzales agreed to using the jury district?

A: What was the question again?

Q: Would - - since - - I believe you previously testified that Ms. Gonzales agreed to using the jury district; is that correct?

A: That's correct.

On cross-examination, however, Papendick acknowledged that Gonzales never specifically stated on the record: "I waive having only a Buffalo County jury."

[¶17.] Finally, the State called Mark Smith, a lawyer with over 30 years of experience as a private practitioner, state's attorney, assistant attorney general, and magistrate judge, to testify as an expert witness. Based on his review of the underlying trial transcript, Smith testified that Gonzales had been advised by her attorneys concerning the venue of the trial and the makeup of the jury district.[10]

---

10. Smith prepared a written report, Exhibit 10, which listed a number of hearings at which the court discussed with Gonzales and her counsel the issue of venue and using a jury district authorized by the standing order to empanel the venire, namely: a May 7, 2013 motion hearing; a September 27, 2013 motion hearing where the court discussed the issue of where to hold the

(continued . . .)

Smith also testified that—because the jury pool contained, at most, only 7% fewer Native Americans than the overall population of the jury district—the jury represented a fair cross-section of the community.[11]  After the close of the evidence, both parties submitted post-trial briefs.

[¶18.]     On March 12, 2023, the habeas court released a memorandum opinion granting habeas relief.  The court did not analyze Gonzales' ineffective assistance claim.  Instead, it focused on the composition of the jury pool as a freestanding issue.  The court noted that the ineffective assistance claims asserting a failure to advise Gonzales of the jury composition issue and object thereto "are subsumed in her larger claims of direct structural error in the selection of the jury pool."  As to the freestanding claim, the court concluded that, in violation of the state and federal constitutions, "[a]pplication of the blended jury pool district concept in this case had the pernicious effect of excluding members of Gonzales' community and race from the process that determined her liberty."  The State appealed, raising the following issues:

> 1.     Whether the habeas court erred in its interpretation and construction of the United States and South Dakota Constitutions.

---

(. . . continued)
  trial—Gann Valley or Chamberlain—and asked for a decision from counsel in the near future; a February 28, 2014 pretrial conference at which there was a lengthy discussion between the court and counsel about the logistics of summoning jurors from Buffalo and Brule Counties, the plan to send the sheriff to encourage Buffalo County jurors to complete the initial questionnaire, and the method of exercising peremptory challenges.

11.   This disparity of 7% was calculated by subtracting the percentage of Native Americans in the jury pool—22%—from the percentage of Native Americans in the jury district population—29%.

2. Whether the habeas court erred in its application of the *Duren* test.

3. Whether the habeas court erred in determining that the alleged errors in Gonzales' trial constituted structural error.

**Standard of Review**

[¶19.] "A habeas corpus applicant has the initial burden of proof to establish a colorable claim for relief." *Neels v. Dooley*, 2022 S.D. 4, ¶ 10, 969 N.W.2d 729, 733 (quoting *Jenner v. Dooley*, 1999 S.D. 20, ¶ 11, 590 N.W.2d 463, 468). "However, '[h]abeas corpus is not a substitute for direct review.'" *Id.* (alteration in original) (citing *Loop v. Class*, 1996 S.D. 107, ¶ 11, 554 N.W.2d 189, 191). "Habeas corpus can be used only to review (1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether an incarcerated defendant has been deprived of basic constitutional rights." *Jenner*, 1999 S.D. 20, ¶ 11, 590 N.W.2d at 468 (citation omitted). "We may affirm the ruling of the habeas court if it is 'right for any reason.'" *Erickson v. Weber*, 2008 S.D. 30, ¶ 17, 748 N.W.2d 739, 744 (citation omitted). "We review findings of fact under the clearly erroneous standard, while we give no deference to conclusions of law and thereby apply the de novo standard." *Id.*

## Analysis

### 1.  Whether the habeas court erred in its interpretation and construction of the United States and South Dakota Constitutions.

[¶20.]      "[T]his Court reviews de novo issues of constitutional interpretation." *Dakota Constructors, Inc. v. Hanson Cnty. Bd. of Adjustment*, 2023 S.D. 38, ¶ 12, 994 N.W.2d 222, 227.  "When interpreting constitutional text, the goal is to discern the most likely public understanding of a particular provision at the time it was adopted."  *McDonald v. City of Chicago*, 561 U.S. 742, 828, 130 S. Ct. 3020, 3072, 177 L. Ed. 2d 894 (2010) (Thomas, J., concurring in part).  Original meaning can be discerned from "'historical context' of a constitutional provision"—including constitutional debates and case law.  *Doe v. Nelson*, 2004 S.D. 62, ¶ 10, 680 N.W.2d 302, 305–06 (quoting *Cleveland v. BDL Enters., Inc.*, 2003 S.D. 54, ¶ 40, 663 N.W.2d 212, 223).

[¶21.]      At the outset, we note that the habeas court interjected the concept of vicinage, which had not been raised by either party.  It appears from the record that the court conducted and presented its own research concerning this new theory at the habeas trial:

> But the argument is [the jury district] shouldn't have been [both Buffalo and Brule Counties].  It should have been just Buffalo.  I mean, I have known that is the issue in the case since I got the case.  That is why I have been so interested in this case.  When I was visiting the library at [a college] back in November and went into the library and pulled a volume on "The History of English Common Law on Juries," and I will quote it to you right now.  I just happened to find this volume while I was browsing around, but I thought . . . maybe they have something on the history of jury trials in this law library at this college

> because it is a college that has been around since the 1840's.

The court then went on to explain the fundamental principles of the constitutional law in England, particularly those relating to the right of one accused of a crime to a trial by jury. On that issue, the circuit court noted that in England, "the fact of guilt or innocence on a criminal charge was determined in a public court and in the county where the offense was alleged to have occurred[.]"

[¶22.] In its memorandum opinion, the habeas court, relying on several other historical commentaries, dictionary definitions, and discussions in opinions rendered by courts in other jurisdictions, concluded that "the legal concept of 'vicinage' in general is fundamental to a proper understanding" of the reference in Article VI, § 7 of the South Dakota Constitution to a trial by a jury of the "county or district in which the offense is alleged to have been committed." However, there is no vicinage issue here, and the habeas court unnecessarily complicated this case when it conceived of, developed, and ruled on its own argument to support a decision to grant post-conviction relief. *See Ally v. Young*, 2023 S.D. 65, ¶ 49 n.14, 999 N.W.2d 237, 253 n.14 ("Except in rare instances, the court is a neutral party that adjudicates only those issues raised by the parties. By raising issues *sua sponte* and participating as a pseudo-advocate at the evidentiary hearings, the circuit court abandoned its post of neutrality, threatening the integrity of the very process it was tasked with protecting.").

[¶23.] Although the habeas court concluded that the Federal Constitution "does not require trial within a county or vicinage," the court ultimately held that the jury district violated the South Dakota Constitution. In focusing heavily on the

concept of "vicinage," the habeas court reasoned that this historical concept—which refers to a specific neighborhood or community—was incorporated into Article VI, § 7 of the South Dakota Constitution. In other words, jurors in a criminal trial must be from the same "vicinage" or local community where the underlying offense was committed. According to the court, this principle was violated because the jury district "disregarded centuries of cultural and communal history and discord" by combining Buffalo and Brule Counties.

[¶24.]	Turning first to the Federal Constitution, the Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. As the State points out, this provision specifically does not use the term "vicinage" and instead focuses on the more definite and readily discernible terms "State and district." This is perhaps because "vicinage" was "too vague if depending on limits to be fixed by the pleasure of the law [and] too strict if limited to the county." *Williams v. Florida*, 399 U.S. 78, 95, 90 S. Ct. 1893, 1903, 26 L. Ed. 2d 446 (1970). As a result, Congress has defined "districts" as the various federal judicial districts and divisions throughout the country.[12] *See* William W. Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue*, 43 Mich. L. Rev. 59, 66 (1944).

---

12. "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

[¶25.] Gonzales argues that this requirement—an impartial jury from the State or district where the crime was committed—has been incorporated and applies to the States through the Due Process Clause of the Fourteenth Amendment. In support of this proposition, Gonzales cites *Nebraska Press Association v. Stuart*, where the Supreme Court held that "[b]ecause 'trial by jury in criminal cases is fundamental to the American scheme of justice,' the Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions." 427 U.S. 539, 551, 96 S. Ct. 2791, 2799, 96 L. Ed. 2d 683 (1976) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S. Ct. 1444, 1447, 20 L. Ed. 2d 491 (1968)). Although the Supreme Court recognized that the right to a trial by an impartial jury applies to the States, it makes no mention of any requirement that the jury be of the "State and district."

[¶26.] But, both state and federal courts have concluded that the "State and district" requirement has not been applied to the states. In discussing incorporation, the Supreme Court of California explained:

> Because a vicinage guarantee does not serve the purpose of protecting a criminal defendant from government oppression and is not necessary to ensure a fair trial, it is not an essential feature of the right to jury trial. For that reason, we conclude that the vicinage clause of the Sixth Amendment is not applicable to the states through the Fourteenth Amendment.

*Price v. Superior Ct.*, 25 P.3d 618, 630 (Cal. 2001). *See also Caudill v. Scott*, 857 F.2d 344, 345 (6th Cir. 1988) (per curiam) (holding that in federal prosecutions, a defendant need only be tried in the federal district where the offense was committed); *Zicarelli v. Dietz*, 633 F.2d 312, 325–26 (3d Cir. 1980) (*Zicarelli II*) ("[W]e conclude that the provision of the Sixth Amendment providing for the right

to have a jury from a district 'previously ascertained by law' applies only to federal criminal trials, and not to state criminal trials."). We agree, and we note, in any event that, the State of South Dakota is one single federal district, and Gonzales' trial in Brule County would comply with the district clause of the Sixth Amendment.

[¶27.] We next consider Article VI, § 7, of the South Dakota Constitution which provides that "[i]n all criminal prosecutions the accused shall have the right to . . . a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed." S.D. Const. art. VI, § 7. "Where a constitutional provision is quite plain in its language, we construe it according to its natural import." *Brendtro v. Nelson*, 2006 S.D. 71, ¶ 16, 720 N.W.2d 670, 675. When Article VI, § 7 was drafted, "district" was defined as "one of the portions into which an entire state or country may be divided for judicial, political, or administrative purposes." *District*, Black's Law Dictionary (1st ed. 1891). This definition would seem to include the use of jury districts where a single county had such a limited population that it would be difficult to summon an adequate number of prospective jurors.

[¶28.] Nevertheless, the habeas court determined that the meaning of "district" was ambiguous. The court cited to language from this Court's holding in *In re Nelson*, a 1902 decision, to suggest that the word "district"—due to its supposed ambiguity—has been judicially "eliminated" from Article VI, § 7. *See* 19 S.D. 214, 102 N.W. 885, 887–88 (1902). A closer reading of *Nelson*, however, reveals this is not the case.

[¶29.]     In *Nelson*, this Court considered the constitutionality of a statute that authorized the removal of certain criminal proceedings to another county. *Id.* The Court held that a change of venue, without the defendant's consent, would violate the constitutional guarantee of a trial by an impartial jury of the "county or district" where the crime occurred. *Id.* However, this Court used limited and precise language to interpret Article VI, § 7:

> There is nothing uncertain or ambiguous in this language, except, perhaps, the use of the word "district," which has uniformly been construed to mean the trial district, or territory from which the jury is summoned. In this state, where unorganized territory may be attached to an organized county for judicial purposes, the phrase *"judicial subdivision," frequently found in our statutes, would have more accurately defined the right than the word "district."* However, *so far as this proceeding is concerned*, the clause may be considered as if the word "district" were eliminated, *as the territory from which the jury would be selected is coextensive with the boundaries of Lyman county.*

*Id.* at 887.  (Emphasis added.)

[¶30.]     Thus, the "elimination" of "district" was confined to the specific set of circumstances found in *Nelson*, where the county and territory boundaries were coextensive. The reference to "unorganized territory attached to an organized county" was not central to the holding in *Nelson*, and in any event, we have never held that a "district" under Article VI, § 7 could only ever apply to unorganized counties attached to organized ones, as the habeas court held. Indeed, *Nelson* explicitly suggests that "district" should be understood as a "judicial subdivision," which would seem to encompass administrative jury districts created under the statutory authority of SDCL 16-13-18.4.

[¶31.] The habeas court also pointed to *In re Oberst*, where the Kansas Supreme Court reasoned that "district" applied only to the historical concept of territorial districts outside of organized counties. *See* 299 P. 959 (Kan. 1931). However, we are not persuaded by this authority, and conclude that the plain meaning of "district" in Article VI, § 7 can also encompass judicial administrative districts created by statute.[13] We thus hold that the use of a jury district comprised of Buffalo and Brule Counties does not violate the "county or district" terminology of Article VI, § 7.[14]

[¶32.] According to Article VI, § 7, Gonzales is entitled to a petit jury either from Buffalo County or from the overall jury district, which would necessarily include both Buffalo and Brule County residents. Because the latter occurred in this case, Article VI, § 7 is satisfied.

### 2. Whether the habeas court erred in its application of the Duren test.

[¶33.] The Sixth Amendment guarantees the right to an "impartial jury of the State and district wherein the crime shall have been committed." U.S. Const.

---

13. The Legislature has empowered the presiding judge in each judicial circuit to create jury districts where an individual county has a population of less than five thousand. SDCL 16-13-18.4. Similarly, under the Federal Constitution, Congress has defined specific judicial districts for federal courts. *See* 28 U.S.C. § 1861.

14. Gonzales suggests that the jury district violated SDCL 16-13-18.4 by including fewer than 10,000 residents. However, this claim was not made on direct review, and Gonzales offers no authority to support the cognizability of such a statutory claim in this habeas action. Moreover, SDCL 16-13-18.4 specifically allows for the combination of counties into a jury district "*until* the total population of the counties exceeds ten thousand." (Emphasis added.) Thus, the statute does not require that the jury district population reach 10,000.

amend. VI.  Unlike the "State and district" requirement, the right to an impartial jury drawn from a fair cross-section of the community has been incorporated against the States through the Fourteenth Amendment.  *See State v. Hall*, 272 N.W.2d 308, 310 (S.D. 1978).  As a result, this Court has adopted the Supreme Court's *Duren* test to determine whether a particular jury was selected in compliance with the fair cross-section requirement.  *See State v. Wright*, 2009 S.D. 51, ¶ 48, 768 N.W.2d 512, 529 (applying *Duren*, 439 U.S. 357, 99 S. Ct. 664).  In order to establish a claim under *Duren*, a party must prove: "(1) the group excluded is a 'distinct' group in the community; (2) the representation of this group in the jury pool is not fair and reasonable in relation to the number of such persons in the community; (3) this under representation is due to the systematic exclusion of the group from the jury selection-process." *Duren*, 439 U.S. at 363, 99 S. Ct. at 668.

[¶34.]     It is uncontested that Native Americans are a distinct group under the first prong of *Duren*.  *See St. Cloud*, 1996 S.D. 64, ¶ 11, 550 N.W.2d at 74.  The second prong, however, requires further analysis.  In *St. Cloud*, the defendant argued on habeas that his constitutional right to a jury comprised of a fair cross-section of the community had been violated because Native Americans were underrepresented on the jury panel.  *Id.* ¶ 5, 550 N.W.2d at 72.  This Court noted that the absolute disparity between the Native American proportion in the relevant county and the jury pool was 12.5%, which was "less than the 15% underrepresentation at which the jury panel should be supplemented." *Id.* ¶ 19, 550 N.W.2d at 76.

[¶35.]	Performing a similar analysis in this case, the habeas court compared the demographics of the combined jury panel with the demographics of Buffalo County, not the overall jury district. As a result of this comparison, the court determined that there was an absolute disparity of at least 58% between the predicted proportion of Native American residents in the jury pool (26%)[15] and the proportion of Native American residents in Buffalo County (84%).

[¶36.]	The 26% proportion was based, in part, on testimony from Obago concerning her identification—based on personal knowledge—of Native American residents on the jury pool list. Obago admitted that she did not verify the Native American heritage of the prospective jurors by checking the tribal roles. The State argues that such identification is insufficient to establish the proportion of Native American residents in the jury pool. It is well established that Gonzales bears the burden of proof in these habeas proceedings. *See Davi v. Class*, 2000 S.D. 30, ¶ 26, 609 N.W.2d 107, 114. We decline to determine whether Obago's personal knowledge meets this bar because, even assuming that her numbers are correct, no constitutional violation has occurred.

[¶37.]	The State contends that the habeas court based its conclusions on the wrong community—namely the population of Buffalo County instead of the overall

---

15.	The habeas court acknowledged that Obago's testimony could have undercounted the percentage of Native American jurors in the jury pool because she had less personal knowledge of the Native American population in Brule County. Using the expected proportion of Native American residents from Brule County with the known Native American residents in the pool from Buffalo County, the court determined an expected Native American percentage in the jury pool of 26%, which was slightly higher than the 22% identified by Obago.

jury district.  As we have previously discussed, the 2011 standing order combining the populations of Brule and Buffalo Counties into a jury district does not violate the State or Federal Constitutions.  Thus, the relevant community is the combined jury district.  Brule and Buffalo Counties, together, have a combined population that is 29% Native American.  Obago was able to identify 22% of the jury pool as Native American residents of Brule and Buffalo Counties.  Thus, the absolute disparity is only 7%—and potentially less given Obago's unfamiliarity with Brule County residents—well below the constitutional threshold limit of 15%.  *See St. Cloud*, 1996 S.D. 64, ¶ 13, 550 N.W.2d at 74; *United States v. Erickson*, 436 F. Supp. 3d 1242, 1254 (D.S.D. 2020), *aff'd*, 999 F.3d 622 (8th Cir. 2021) (finding no substantial underrepresentation where the disparity was 7.4%).

[¶38.]        Because of this inability to meet the second prong of *Duren*, Gonzales has failed to establish that the jury pool did not represent a fair cross-section of the community.  The habeas court thus erred in its application of the *Duren* test and in its conclusion that Gonzales' Sixth Amendment rights were violated.

> **3.      *Whether the habeas court erred in determining that the alleged errors in Gonzales' trial constituted structural error.***

[¶39.]        Generally, in habeas review, constitutional error alone is not sufficient for relief; actual prejudice must be shown.  *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722, 123 L. Ed. 2d 353 (1993).  As the habeas court correctly noted, the Supreme Court has held that racial exclusions from a grand jury constitute structural error.  *See Vasquez v. Hillery*, 474 U.S. 254, 263–64, 106 S. Ct. 617, 623–24, 88 L. Ed. 2d 598 (1986).  In addition to this holding, the *Vasquez* Court

also suggested that the selection of a petit jury based on improper criteria would constitute structural error "because the effect of the violation cannot be ascertained." *Id.* at 263. However, because there is no constitutional error present in this case, any analysis of structural error is unnecessary.

### Conclusion

[¶40.]     The habeas court erred in concluding that the jury district created by the 2011 standing order violated Gonzales' right under the South Dakota Constitution to a trial from the "county or district" where the offense was committed. The habeas court also erred by concluding that Gonzales established a violation of the Sixth Amendment of the Federal Constitution based on her claim that she was denied a jury from a fair cross-section of her peers under *Duren*. Given these determinations, Gonzales' ineffective assistance claims relating to these same issues are also without merit. Because Gonzales has failed to demonstrate any deprivation of her constitutional rights to a fair and impartial jury and to the effective assistance of counsel, she is not entitled to habeas relief. We therefore reverse and vacate the judgment and order granting such relief.

[¶41.]     DEVANEY and MYREN, Justices, and HENDRICKSON, Circuit Court Judge, concur.

[¶42.]     SALTER, Justice, concurs specially.

[¶43.]     HENDRICKSON, Circuit Court Judge, sitting for JENSEN, Chief Justice, who deemed himself disqualified and did not participate.

SALTER, Justice (concurring specially).

[¶44.] I join the entirety of the Court's opinion, and I write specially to note the unusual procedural posture we confront in this habeas appeal. The parties and the habeas court have treated the vicinage and cross-section arguments presented here as freestanding habeas claims. They may not be. Neither was argued on direct appeal, and the habeas court opted not to determine the vicinage and cross-section claims within an ineffective assistance of counsel claim because it considered them to be claims of structural error, which, in the court's view, rendered the claims cognizable on collateral review.

[¶45.] Structural errors are incapable of being assessed for harmlessness, and we have recognized that they can be cognizable in a habeas case. *See Guthmiller v. Weber*, 2011 S.D. 62, ¶ 16, 804 N.W.2d 400, 406. But *Guthmiller* did not hold that a structural error habeas claim was exempt from the rule that requires a petitioner to present claims, where possible, on direct appeal. *See Piper v. Young*, 2019 S.D. 65, ¶¶ 22–24, 936 N.W.2d 793, 804–05 (stating claim preclusion rules applicable in habeas actions). And, in my view, our ability to review a defaulted claim of structural error that could have been litigated on direct appeal presents a different question. *See e.g., Taylor v. Comm'r of Corr.*, 153 A.3d 1264, 1275 (Conn. 2017) ("[T]he petitioner's claim of structural defect was procedurally defaulted precisely because it was a claim that could have, and should have, been raised at trial or on direct appeal.").

[¶46.] However, the prospect of vacating the circuit court's decision because of an unexcused default presents its own challenges. Because the default issue was

not litigated by the parties before the habeas court or in this appeal, we lack the benefit of the parties' arguments on this novel and unsettled issue. *See St. Cloud v. Leapley*, 521 N.W.2d 118, 123–24 (S.D. 1994) (prohibiting a habeas respondent from raising the affirmative defense of procedural default for the first time on appeal).

[¶47.] Therefore, under the circumstances, I agree that we should reach the merits of the case and determine it under the Court's analysis, reserving our consideration of the procedural default issue for another day.